No. 24-12448

In the United States Court of Appeals
for the Eleventh Circuit

_____

**United States of America**,

*Plaintiff-Appellant*,

v.

**Kevan Gibbs, II**,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Northern District of Florida
USDC No. 4:23cr61-MW/MAF

_____

**Initial Brief of the United States**

Jason R. Coody
United States Attorney

Jordane New
Assistant United States Attorney
Appellate Division
111 N. Adams Street, 4th Floor
Tallahassee, Florida 32301
(850) 942-8430

ECCA No. 24-12448                     *United States v. Kevan Gibbs, II*
USDC No. 4:23cr61-MW/MAF

## CERTIFICATE OF INTERESTED PERSONS

Counsel for Appellant, United States of America, certifies that the following persons may have an interest in the outcome of this proceeding:

Coody, Jason R., United States Attorney

Davies, Robert G., Assistant United States Attorney

DeBelder, Joseph F., Federal Public Defender

Fitzpatrick, Martin A., United States Magistrate Judge

Gibbs, Kevan C., II, Defendant-Appellee

Keen, Justin M., Assistant United States Attorney

Kime, Stacey Niles, Assistant Federal Public Defender

Milligan, Gary K., Assistant United States Attorney

Minor Victim 1

New, Jordane L., Assistant United States Attorney

Vallejo, Elizabeth L., Assistant Federal Public Defender

Walker, Mark E., Chief United States District Judge

JORDANE NEW
Assistant United States Attorney

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument.

TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. C1

Statement Regarding Oral Argument............................................................. i

Table of Contents ........................................................................................... ii

Table of Citations........................................................................................... iv

Statement of Jurisdiction.............................................................................. vii

Statement of the Issues................................................................................... 1

Statement of the Case ..................................................................................... 2

    I.   Course of Proceedings ................................................................. 2

    II.  Statement of Facts....................................................................... 2

        A. *After a CyberTip and Three State Search Warrants, Investigators Discover Evidence that Gibbs was Sexually Abusing a 14-Year-Old Girl* ......................................... 2

        B. *Gibbs Moved to Suppress Evidence Obtained from the Warrants* ..... 10

        C. *The District Court Granted Gibbs's Motion, Find the Good Faith Exception Inapplicable*............................................................. 12

    III. Standards of Review................................................................. 17

Summary of the Argument........................................................................... 18

Argument ...................................................................................................... 20

    I.   The District Court Erred in Declining to Apply the Good Faith Exception ............................................................. 20

        A. *The Synchronoss Warrant was Not So Lacking in Indicia of Probable Cause that Belief in Its Existence was Objectively Unreasonable* ..... 23

ii

*B.  Detective Osborn's Reliance on the Synchronoss Warrant was Objectively Reasonable*……………………………………………32

*C.  The District Court's Criticisms Do Not Establish Bad Faith*……….36

Conclusion……………………………………………………………………43

Certificates of Compliance & Service…………………………………………44

TABLE OF CITATIONS

## Federal Cases

*Davis v. United States*, 564 U.S. 229 (2011)......................................................42

*Feliciano v. City of Miami Beach*, 707 F.3d 1244 (11th Cir. 2013).....................26

*Herring v. United States*, 555 U.S. 135 (2009)....................................................34

*Hooks v. Brewer*, 818 F.App'x 923 (11th Cir. 2020).........................................38

*Hudson v. Michigan*, 547 U.S. 586 (2006).........................................................42

*Illinois v. Gates*, 462 U.S. 213 (1983) ..................................... 16, 20, 27, 33, 40

*Kaley v. United States*, 571 U.S. 320 (2014) .....................................................20

*Knight v. Jacobson*, 300 F.3d 1272 (11th Cir. 2002)..........................................26

*United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002).......................23-24, 32

*Massachusetts v. Sheppard*, 468 U.S. 981 (1984)................................................35

*Messerschmidt v. Millender*, 565 U.S. 535 (2012)....................................... 24, 35

*Murray v. United States*, 487 U.S. 533 (1988)....................................................38

*United States v. Robinson*, 336 F.3d 1293 (11th Cir. 2003)....................32, 36, 41

*United States v. Taxacher*, 902 F.2d 867 (11th Cir. 1990) .....................33, 35, 41

*Taylor v. Alabama*, 457 U.S. 687 (1982)............................................................26

*Texas v. Brown*, 460 U.S. 730 (1983) .................................................................20

*United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2010)...............................25

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).......................................33

*United States v. Cameron*, 652 F. Supp. 2d 74 (D. Me. 2009)...........................27

*United States v. Cannon*, 703 F.3d 407 (8th Cir. 2013) .....................................40

*United States v. Cotto*, 995 F.3d 786 (10th Cir. 2021).......................................35

*United States v. Delancy*, 502 F.3d 1297 (11th Cir. 2017) ................................42

*United States v. Glinton*, 154 F.3d 1245 (11th Cir. 1998)..................................24

*United States v. Landreneau*, 967 F.3d 443 (5th Cir. 2020).............................28

*United States* v. *Lapsins*, 570 F.3d 758 (6th Cir. 2009)...................................28

*\*United States v. Leon*, 468 U.S. 897 (1984)...................................21-23, 34, 36

*United States v. Lockett*, 674 F.2d 843 (11th Cir. 1982) ...................................39

*United States v. Martinelli*, 454 F.3d 1300 (11th Cir. 2006).............................27

*\*United States v. McCall*, 84 F.4th 1317 (11th Cir. 2022) ................ 17, 20-25, 32

*United States v. Meals*, 21 F.4th 903 (5th Cir. 2021)........................................28

*United States v. Miller*, 24 F.3d 1357 (11th Cir. 1994)....................................37

*\*United States v. Morales*, 987 F.3d 966 (11th Cir. 2021).......................22-24, 32

*United States v. Novation*, 271 F.3d 968 (11th Cir. 2001)................................38

*United States v. Ortiz*, 422 U.S. 891 (1975) ......................................................33

*United States v. Ventresca*, 380 U.S. 102 (1965) ..............................................37

*United States v. Watkins*, 13 F.4th 1202 (11th Cir. 2021) ........................... 41-42

*United States v. Williams*, 177 F.App'x 914 (11th Cir. 2006)...........................27

**Federal Statutes**

18 U.S.C. § 2251(a).................................................................................................2

18 U.S.C. § 2252A...................................................................................................2

18 U.S.C. § 2256 ...................................................................................................29

18 U.S.C. § 2258A.................................................................................6, 26, 34, 41

18 U.S.C. § 2258B ................................................................................................26

18 U.S.C. § 3231 ..................................................................................................vii

18 U.S.C. § 3731 ........................................................................................vii

**State Statutes**

Fla. Stat. § 775.0847 ..................................................................................29

Fla. Stat. § 827.071 .....................................................................................3

Fla. Stat.  § 933.02 .......................................................................................3

Fla. Stat. § 934.02 ......................................................................................30

## STATEMENT OF JURISDICTION

This is an interlocutory appeal taken by the United States from the district court's June 27, 2024 order granting Defendant Kevan Gibbs's motion to suppress evidence. Doc. 41. The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. On July 26, 2024, the United States filed a notice of appeal in which the United States Attorney certified that the appeal is not taken for purpose of delay and the evidence suppressed by the district court is substantial proof of a fact material in this prosecution. Doc. 47. Accordingly, this Court's jurisdiction arises under 18 U.S.C. § 3731.

STATEMENT OF THE ISSUES

I.  Did the district court err in finding that the *Leon* good faith exception did not apply to an officer's reliance on a warrant to search Gibbs's cloud account?

STATEMENT OF THE CASE

I.  Course of Proceedings

In November of 2023, a grand jury sitting in the Northern District of Florida issued a two-count indictment charging Defendant-Appellee Kevan Gibbs, II, with sexual exploitation of minors, in violation of 18 U.S.C. § 2251(a), and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Doc. 1. Gibbs moved to suppress the child pornography evidence against him prior to trial. Docs. 32, 38. On June 26, 2024, the district court granted the motion to suppress in part, suppressing the fruits of three state search warrants. Doc. 41 at 8.

II.  Statement of Facts

*A.  After a CyberTip and Three State Search Warrants, Investigators Discover Evidence that Gibbs was Sexually Abusing a 14-Year-Old Girl*

In 2022, an administrator of Synchronoss Technologies—the cloud storage for Verizon, Doc. 39-1—alerted the National Center for Missing and Exploited Children (NCMEC) that a user had uploaded suspected child sexual abuse material (CSAM) to their account on or about June 15, 2022. Doc. 38 at 48. NCMEC sent a CyberTip to law enforcement with this information and included the user's phone number. *Id.* The tip eventually made its way to Tallahassee Police Department (TPD) Detective Paul Osborn, who reviewed it on October 26, 2022. *Id.*

On January 3, 2023, Detective Osborn presented a Florida state-court judge with a warrant application to search the Synchronoss account that was the subject of the CyberTip. *Id.* at 17-23. Immediately underneath the "APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT" title, the application stated: *Electronic Service Provider, F.S. 933.02.*[1] *Id.* at 17 (emphasis in original). It described the place to be searched as "Synchronoss Technologies," at a New Jersey address and the property to be seized as content from the Synchronoss account. *Id.* The affidavit asserted that there was probable cause to believe the user of the targeted Synchronoss account had violated Florida Statutes § 827.071(5) by possessing child pornography. *Id.* at 17. The substance of Detective Osborn's affidavit was divided into three sections.

The first section detailed Detective Osborn's background, experience, and employment history. *Id.* at 18. This included that Detective Osborn had been employed as a TPD officer for 20 years and had spent the last 7.5 years assigned to the Special Victims Unit (SVU) with duties that included "taking an active role in criminal investigations that relate to the online exploitation of children." *Id.* As part of the SVU, Detective Osborn served as a member of the North

---

[1] Florida Statutes § 933.02 establishes the grounds upon which a search warrant may be based.

Florida Internet Crimes Against Children (ICAC) Task Force.[2] *Id.* The affidavit explained that Detective Osborn had "an understanding of the Internet and [had] participated in investigations involving undercover chat sessions, child sexual-solicitation, and the receipt, transportation, distribution and possession" of child sexual abuse material. *Id.* It further explained that he had "attended more than 1,500 hours of advanced training" in child exploitation topics, "provided formal trainings on multiple occasions," and been designated an expert in "child sexual abuse/exploitation material investigations" in state court. *Id.* It also recounted that Detective Osborn had "investigated more than 600 CyberTipline Reports since 2014" and had actively investigated or assisted the investigation of numerous child exploitation offenses, including through the execution of search warrants "pertaining to the possession, collection, production, and/or transportation" of CSAM. *Id.* In sum, the affidavit conveyed that Detective Osborn is an experienced law enforcement officer who is particularly knowledgeable in the area of child exploitation investigations and internet CyberTips. *Id.*

---

[2] The ICAC "is a national organization which provides specialized high-technology training and resources to law enforcement agencies that investigate crimes dealing with online sexual-solicitation and sexual-exploitation of children, including the collection and trading of child sexual abuse/exploitation material." *Id.* at 18.

The second section, titled "DEFINITIONS," provided "several important definitions that affect the day-to-day investigation of internet-based crimes against children." *Id.* Those definitions included the following:

- "'Child Pornography'" includes the definition in § 775.0847(1)(b), Florida State Statutes, "any image depicting a minor engaged in sexual conduct." *Id.* at 19.

- "Sexual Conduct" includes the definition in § 775.0847(1)(f) and § 827.071(1)(h), Florida State Statutes, "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such a person is a female, breast with the intent to arose or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed." *Id.* at 19.

- "The National Center for Missing and Exploited Children (NCMEC) is a private, non-profit organization … that … tracks missing and exploited children, [] serves as a repository for information about child pornography," and "[c]ompanies that suspect child pornography has been stored or transmitted on their systems can report that information to

NCMEC in the form of a CyberTipline Report (CyberTip). The reporting requirements of Electronic Communication Service Providers and Remote Computing Service Providers is [sic] discussed in 18 U.S.C. § 2258A." *Id.*

- "Electronic Service Providers (ESPs), formerly known as ISPs (Internet Service Providers), are commercial organizations that are in business to provide individuals and businesses access to the Internet. ESPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment …. ESPs maintain records pertaining to their subscribers" which "may include … information concerning content uploaded and/or store on or via the ESPs servers …. This service by ESPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files." *Id.*

- "CyberTipline Report (CyberTip) is an investigative report that is transmitted to law enforcement as part of their authority delegated by 18 U.S.C. § 2258A …. In the case of an ESP, the ESP can provide to NCMEC information about the child exploitation activity it believes has occurred, including the incident type, the incident time, any screen or user names associated with the activity, any IP address … as well as other information it may have collected in connection with the suspected criminal activity.

Other than the incident type and incident time, the remainder of the information the ESP provides is voluntary and undertaken at the initiative of the reporting ESP. The ESP may also upload to NCMEC any files it collected in connection with the activity. The ISP [sic] may or may not independently view the content of these uploaded files …. NCMEC then packages the information from the ISP [sic] along with any additional information it has, such as previous related CyberTipline Reports, and sends it to law enforcement in the jurisdiction where the activity is thought to have occurred." *Id.* at 20.

- "Categorization System is a tool created by ESPs in January 2014 to assist with the categorization of images received by ESPs. The system categorizes images related to CyberTipline Reports into four categories. Those categories are listed as follows:

  o A1 - Any image of sexually explicit conduct, bestiality, masturbation, sadistic or masochistic abuse, degradation or any such depiction that lacks serious literary, artistic, political, or scientific value that involves a prepubescent minor.

  o A2 - Any image depicting nudity and one or more of: restraint, sexually suggestive poses, focus on genitals, inappropriate touching, adult arousal, spreading or limbs or genitals, and such depiction lacks serious literary, artistic, political, or scientific value that involves a prepubescent minor.

  o B1 - Any image of sexually explicit conduct, bestiality, masturbation, sadistic or masochistic abuse, degradation or any such depiction that

lacks serious literary, artistic, political, or scientific value that involves a pubescent minor.

- o  B2 - Any image depicting nudity and one or more of: restraint, sexually suggestive poses, focus on genitals, inappropriate touching, adult arousal, spreading or limbs or genitals, and such depiction lacks serious literary, artistic, political, or scientific value that involves a pubescent minor."

*Id.* at 20-21.

The definitions section also defined numerous other terms relevant to child exploitation investigations, including "Internet Protocol Address (IP Address," "Log File," "Metadata," "Compressed File," and "Hash Value." *Id.* at 20-22.

Finally, the affidavit included a section titled "PROBABLE CAUSE." *Id.* at 22. It provided:

On 10/26/2022, I reviewed Cybertip # 127205611, which was generated by the National Center for Missing and Exploited Children (NCMEC) after an administrator of Synchronoss advised a user uploaded suspected child sexual abuse material to their account on, or about, 06/15/2022.

This following suspect information was included in the tip:
Phone: 7792274759

*Id.* at 22. The affidavit further explained that the "case was initially assigned to law enforcement" in Alabama but that "they discovered the suspect now resides" in Tallahassee. *Id.* It went on to state that Detective Osborn had "conducted a query" for the listed suspected and confirmed a Tallahassee address. *Id.* This section also stated that "Synchronoss Technologies is an

electronic communication service as defined in F.S. 934.02(15) and/or a remote computing service as defined in F.S. 934.02(19)." *Id.*

At the very end, the affidavit explained that it had been "[r]eviewed and approved by Tallahassee Police Department Legal Advisor Theresa Flury this 29th day of December 2022." *Id.* at 23. The warrant was signed by a Leon County Judge on January 3, 2023. *Id.*

When Detective Osborn executed the Synchronoss warrant, he found images and videos of a male who appears to be Gibbs sexually abusing a 14-year-old girl with whom he lived.[3] *Id.* at 5, 35-36, 48. Based on that evidence and the Synchronoss CyberTip, Detective Osborn obtained a warrant for a pen register and trap and trace device for Gibbs's phone number. *Id.* The data obtained from that warrant led law enforcement to Gibbs's location in Romeoville, Illinois, at an Extended Stay America motel. *Id.* at 52. On January 27, 2023, investigators in Illinois obtained a search warrant for Gibbs's person, room, vehicle, and cell phone. *Id.* at 55-56. The Illinois warrant relied on the same information as the Synchronoss warrant as well as the evidence recovered through the prior searches. *Id.* Law enforcement found and arrested Gibbs at the

---

[3] According to the investigative materials, Gibbs and his wife were in a romantic "quad" relationship with another couple. Doc. 38 at 32-33. The couples lived together with their four children (none of which are the biological children of Gibbs), with each adult taking "a parental role in each of the children's lives." *Id.* The victim in this case is the biological daughter of the other couple. *Id.*

Extended Stay. *Id.* at 29-32. They also located the victim, who later told investigators that Gibbs had been sexually abusing her in both Florida and Illinois for about seven months. *Id.* Gibbs initially spoke with investigators but discontinued the interview and requested an attorney when confronted with the evidence from the Synchronoss warrant. *Id.* at 28-29. The search of Gibbs's cellphone produced additional images and videos of him sexually abusing the victim. *Id.* at 36-38.

### B. *Gibbs Moved to Suppress Evidence Obtained from the Warrants*

Gibbs moved to suppress the evidence obtained from the Synchronoss warrant and all evidence resulting from it. Docs. 32, 38.[4] Of relevance here, Gibbs asserted that the warrant lacked probable cause because Detective Osborn's "bare bones" affidavit did not include "any description of the suspected CSAM" that was allegedly uploaded to the Synchronoss account.[5] *Id.* at 8-9. Without "any factual description of what the material shows," Gibbs contended that the reviewing judge had no ability "to make an independent determination if the material constitutes child pornography." *Id.* at 9-10. Gibbs

---

[4] Gibbs filed a motion to suppress, Doc. 32, followed by an amended motion to suppress, Doc. 38. The amended motion presented the same arguments and authorities as the original but corrected several minor typographical and citation errors. Doc. 38 at 1 n.2; Doc. 40; Doc. 46 at 3. Both motions were filed under seal.

[5] Gibbs raised additional challenges to the warrant, including that it was based on stale information and lacked particularity. *Id.* at 6-8, 11-13. The district court rejected these arguments. Doc. 46 at 46-48; Doc. 41 at 1-2.

further argued that the *Leon* good faith exception did not apply because the affidavit's "complete lack of information" meant that "the criminal conduct was not adequately presented in the first place." *Id.* at 10. Because the child pornography evidence obtained from Synchronoss warrant was used to obtain the subsequent warrants, Gibbs argued that any evidence obtained from those warrants should be excluded as fruit of the poisonous tree. *Id.* at 6-10, 14-15.

The government responded that the Synchronoss warrant "when read as a whole" established probable cause. Doc. 33 at 1, 5-13. It argued that Detective Osborn's "simpl[e] and succinct[]" statement of probable cause was sufficient when considered alongside the other sections of the affidavit, including the definitions of "CyberTip" and the description of the "Categorization System" used by ESPs. *Id.* at 10. When considered collectively, the affidavit left "no doubt that the 'suspected child sexual abuse material' [referred to in the probable cause statement] … constituted a violation" of Florida's child pornography statute "because all categories of images described in [the affidavit] tracked the language of the applicable state statutes." *Id.* at 10, 12. Thus, the government argued, the affidavit "gave the state judge sufficient information … to determine that probable cause existed to believe that evidence of possession of child pornography would be found in Gibbs's Synchronoss account." *Id.* at 10-12. The government alternatively asserted that the *Leon* good faith exception applied

because the affidavit was not so lacking in indicia of probable cause as to render Detective Osborn's reliance on it entirely unreasonable. *Id.* at 13, 22-25. The government conceded that, should the Synchronoss evidence be suppressed, the evidence obtained from the subsequent warrants would be "tainted" and "suppressed as fruit of the poisonous tree." *Id.* at 5.

### C. The District Court Granted Gibbs's Motion, Finding the Good Faith Exception Inapplicable

The district court held a suppression hearing. Doc. 46. Neither party presented testimony during the hearing, and, aside from the warrants and investigative reports, Doc. 38 at 17-56, the only evidence admitted came from Gibbs in the form of a web press release from November 2022 describing Synchronoss and its relationship with the telecommunication company Verizon. Doc. 39-1; Doc. 46 at 4. Among other things, the release explained that Synchronoss manages the Cloud storage network for subscribers of Verizon. Doc. 39-1. That is, "Verizon Cloud subscribers can store photos, videos, and other digital files managed by Synchronoss Personal Cloud." *Id.* The government, for its part, presented no evidence from Detective Osborn.

During oral argument, the district court pressed the government to explain how the affidavit gave the issuing judge knowledge into "what Synchronoss did or did not do and what NCMEC did or did not do" regarding the CyberTip, particularly given the mismatch between the definitions provided and the

language in the probable cause statement. Doc. 46 at 26-29. Drawing on its own knowledge and experience, the district court reminded the government that NCMEC CyberTips can be generated "in a lot of ways" and can sometimes include "very, very specific" details. *Id.* at 27-30, 33-35. The government responded that the affidavit explained "someone at Synchronoss determined that there were images [in the account] that qualified as child pornography such that NCMEC decided it needed to file a [C]yber[T]ip, and it did[.]" *Id.* at 29-30. The government added that it was implicit in the affidavit that the materials fell into one of the four categories of child exploitation material described in the definitional section. *Id.* That is, in the government's view, the "rational application of [the affidavit's] definitions" to Detective Osborn's probable cause statement would be that Synchronoss was an ESP who used the categorization system to generate the NCMEC CyberTip. *Id.* at 38-39. And, when read "in concert," a reviewing judge could reasonably interpret the statement and definitions to establish probable cause. *Id.* at 39-40. Throughout its presentation, the government emphasized that the question of probable cause turned on the information within "the four corners of the warrant." *Id.* at 34, 39, 42. Even so, the government agreed that there was a "spectrum of [C]yber[T]ips" and the detail that comes with them depending on the particular facts and the "ISP that's involved." *Id.* at 33-35.

As for good faith, the government emphasized that Detective Osborn had "tried to put meat on the bones" of his probable cause statement by providing relevant definitions. *Id.* at 40-43. The government also reminded the court that Detective Osborn submitted the affidavit to TPD's legal advisor for review and approval before submitting it to the judge. *Id.* These facts, the government asserted, confirmed that Detective Osborn was acting reasonably and in good faith. *Id.* In response to the court's questioning, the government agreed that Detective Osborn's experience factored into the analysis but argued that it didn't suggest a lack of good faith. *Id.* at 41.

The district court ultimately agreed with Gibbs and granted the motion to suppress the fruits of the Synchronoss warrant. It stated that the probable cause question wasn't even close: Detective Osborn's probable cause statement was "a barebones statement of nothing more than conclusory allegations," and the definitional section did not save it because, even if read together, affidavit as a whole failed to communicate what actually was or was not done by Synchronoss or NCMEC regarding this CyberTip. *Id.* at 48-50. The court reasoned that the affidavit's "data dump" of definitions "makes it worse, not better" because it could imply facts that were not true. *Id.* at 49-50, 55.

The district court went on to conclude that the warrant's deficiencies were bad enough to render the good faith exception inapplicable. At the outset, the

court noted that whether the warrant was signed off by a judge or even approved by an attorney beforehand was "not determinative." *Id.* at 50-51. Instead, those steps suggested that it would be reasonable for Detective Osborn to think the warrant was "okay unless it's just obviously deficient." *Id.* In this case, the court concluded that no reasonably well-trained officer would believe that the combination of "the conclusory statement that some entity told NCMEC that there was unlawful child pornography" and the "generic data dump of definitions completely not linked to the actual tip" would establish probable cause. *Id.* at 52. The court added that a reasonable officer wouldn't have believed that the definitional section "communicated and fixed anything because it doesn't say who did what or when or even … if there were options that they could have done." *Id.* "In fact," the court explained, "a reasonable officer would have known they were telegraphing [or suggesting] to the judge that a bunch of stuff could have been done that they knew wasn't done based on the review of the [C]yber[T]ip." *Id.* at 52, 54-55. The government, the court concluded, was asking it "to infer a whole lot of things [and] stack inferences that" weren't "appropriate based on this record." *Id.* at 53. The court faulted the government for not presenting evidence from Detective Osborn about the contents of the CyberTip and the drafting of the affidavit. *Id.*

The court memorialized its on-the-record ruling in a written order. Doc. 41. It reiterated that a "generalized definition section might support probable cause if the affidavit linked the definitions to the probable cause statement." *Id.* at 3-4. But in the absence of that connection, "boilerplate definitions cannot save the issuing judge's probable cause determination from becoming a 'ratification of the bare conclusions of others.'" *Id.* at 3-4 (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). Further, to the extent the "issuing judge is supposed to infer what investigation was done in this case based on general definitions of tools available," then the inclusion of potentially inapplicable definitions "could in fact mislead that judge into believing that Synchronoss or NCMEC used that particular tool here." *Id.* at 4. As for good faith, the court reiterated that "no reasonably well-trained officer could believe that a conclusory paragraph would allow a judge to independently determine that there was a 'fair probably' that the Synchronoss account contained evidence of a crime." *Id.* at 7. "Instead of facts," the court added, "the issuing judge was made to rely solely on conclusions of two other organizations regarding the contents of the file." *Id.* In the court's view, "a reasonably well-trained officer would understand that padding an affidavit with several pages of definitions of investigative tools risks misleading an issuing judgment into believing these tools were utilized when they were not." *Id.* "Here," the court explained that there were "too many

available routes to CyberTip generation for the fact of a CyberTip, standing alone, to provide a sufficient factual basis for probable cause." *Id.* at 7 n.6.

The court's written order again criticized the government for presenting "no facts with respect to the officer's good faith," such as "what [Detective Osborn] saw when he reviewed the CyberTip, what he communicated to the magistrate outside of the application, if anything, [or] what [he] otherwise knew, thought, or meant." *Id.* at 6-7. Instead of requiring the court to "make assumptions about the facts," the court opined, "the [g]overnment could have provided testimony regarding the facts available." *Id.* But "left with the bare record before it," the court disagreed that *Leon*'s good-faith rule applied. *Id.*

III.  Standards of Review

The district court's denial of a motion to suppress "raises a 'mixed question of law and fact.'" *United States v. McCall*, 84 F.4th 1317, 1322 (11th Cir. 2022). This Court reviews "de novo whether the good faith exception applies," but reviews the "underlying facts upon which that determination is based for clear error." *Id.* (quotation omitted).

SUMMARY OF THE ARGUMENT

I.   The District Court Erred in Declining to Apply the Good Faith Exception

The district court misapplied the law when it concluded that the good faith exception did not apply to Detective Osborn's reliance on the Synchronoss warrant. To be sure, the statement of probable cause was sparse of details. But the warrant as a whole was not so lacking in detail that it provided no hint as to why Detective Osborn believed he would find incriminating evidence in Gibbs's Synchronoss account. The affidavit explained that Detective Osborn had reviewed a CyberTip from NCMEC after a Synchronoss administrator reported that the user had uploaded suspected CSAM. Although the affidavit did not discuss the contents on the CyberTip or explain exactly how it was generated, it included a definitional section conveying the reliability of NCMEC, the nature of a CyberTip, and the categorization system used by ESPs to "categorize[] images related to" CyberTips. The affidavit also implicitly conveyed that Synchronoss was an ESP. Read together in a commonsense fashion, the definitions and probable cause statement provided enough detail and context that an officer's belief in probable cause would not be objectively unreasonable.

The affidavit itself also confirms that Detective Osborn's relied on the warrant in good faith. A reasonable officer with the same extensive training and experience credited to Detective Osborn in the affidavit would know that a

NCMEC CyberTip is a highly reliable indicator of criminal activity. The affidavit also confirms that Detective Osborn sought and obtained approval from TPD's legal advisor prior to its submission and approval by the state judge. A reasonably well-trained officer with Detective Osborn's experience would rely on a warrant based on a NCMEC CyberTip that was approved by both a legal advisor and judge. Because Detective Osborn's reliance on the warrant was objectively reasonable despite the warrant's deficiencies, the district court reversibly erred in declining to apply the good faith exception to the exclusionary rule.

ARGUMENT

I.    The District Court Erred in Declining to Apply the Good Faith Exception

The Fourth Amendment demands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation[.]" U.S. Const. amend. IV. "Probable cause," as the Supreme Court has "often told litigants, is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). The determination of probable cause requires a "practical, common-sense" evaluation of the facts recited in support of a search warrant to determine whether there is a "fair probability that contraband or evidence of a crime will be found." *Gates*, 462 U.S. at 238. This standard "does not deal with hard certainties, but with probabilities," and the evidence "must be seen and weighed … as understood by those versed in the field of law enforcement" who are permitted to rely on "certain common-sense conclusions about human behavior." *Id.* at 231. To cross the probable cause bar, the facts presented in the warrant need only "warrant a [person] of reasonable caution in the belief" that evidence of a crime will be found; there is no requirement that "such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion) (internal quotation marks omitted).

A search completed pursuant to a warrant lacking probable cause violates the Fourth Amendment. *McCall*, 84 F.4th at 1323. The judicially-created

exclusionary rule "generally prohibits the government from relying on evidence obtained in violation of the Fourth Amendment." *Id*. But the Supreme Court has cautioned courts against reflexively applying the exclusionary rule to any Fourth Amendment violation. Instead, the rule applies "in only 'unusual cases'" because it "exacts a heavy toll on both the judicial system and society at large'" in that it "'almost always requires court ignore reliable, trustworthy evidence.'" *Id.* To balance these competing interests, the rule is "therefore limited to situations in which the threat of its application can deter future violations." *Id.* And because "good-faith mistakes cannot be deterred," it applies only where "the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Id.* Consistent with these principles, the "good faith exception" to the exclusionary rule permits the government to rely on evidence obtained in violation of the Fourth Amendment so long as law enforcement acted in objectively reasonable good faith. *United States v. Leon*, 468 U.S. 897, 908 (1984) ("[W]hen law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system.").

The exclusionary rule carries special significance when applied to evidence obtained pursuant to a judicially-authorized warrant. In *Leon*, the

Supreme Court instructed that "courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *Id.* at 900. That is because, "[i]n the ordinary case, an officer cannot be expected to question the [signing judge's] probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* at 920. So, again in the ordinary case, "[p]enalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* Rather, that interest is only served in "four limited sets of circumstances" where the officer "had no reasonable grounds for believing that the warrant was properly issued":

> (1) where the magistrate issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending on the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized— that the executing officers cannot reasonably presume it to be valid.

*United States v. Morales*, 987 F.3d 966, 974 (11th Cir. 2021) (cleaned up).

When in dispute, the government bears the burden of demonstrating the officer's good faith. *Id.* This Court conducts a two-part analysis to determine whether the exception applies. First, it considers whether the case fits into one

of the four limited circumstances where the exception does not apply. *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002). If none of those circumstances is present, then the Court inquires into "whether [the officer] reasonably relied upon the search warrant." *Id.* at 1318. Because the application of the good faith exception is a question of law, this Court owes no deference to the district court's application of the doctrine to the facts. *McCall*, 84 F.4th at 1322.

### A. The Synchronoss Warrant was Not So Lacking in Indicia of Probable Cause that Belief in Its Existence was Objectively Unreasonable

In this case, Gibbs argued and the district court found that Detective Osborn's warrant affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. This question turns on "the face of the particular affidavit," and because "[e]very affidavit and every set of circumstances leading up to a warrant is unique … each affidavit … should be examined thoroughly for probable cause (or an unreasonable lack of it) on a case-by-case-basis." *Martin*, 297 F.3d at 1313. In doing so, "[e]very warrant must be evaluated to determine what facts are included and what critical information has been left out." *Id.* And although this is a fact-intensive inquiry, this Court has well-established guidelines to "determine what critical information should be included in a search warrant affidavit to establish a finding of probable cause." *Morales*, 987 F.3d at 975. That

is, "the affidavit should 'state facts sufficient to justify a conclusion that evidence
… will probably be found at the [place] to be searched" and establish "a link
between [the place] and any criminal activity." *Id.* If the information in the
affidavit comes from an informant, "the affidavit must also demonstrate the
informant's 'veracity' and 'basis of knowledge,'" unless "there is sufficient
independent corroboration[.]" *Martin*, 297 F.3d at 1314. An affidavit is lacking
an indicia of probable cause when it "provide[s] 'no hint' as to why the police
believed they would find incriminating evidence," *McCall*, 84 F.4th 1325, or
when it contains only "a 'bare-bone' statement of nothing more than conclusory
allegations," *See United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).

The "threshold for establishing" that a warrant lacks indicia of probable
cause "is a high one." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012).
Indeed, this Court must conclude that that the officer's judgment was "more
than just 'mistaken'—it [was] so 'plainly incompetent' that 'no officer of
reasonable competence would have requested the warrant[.]'" *McCall*, 84 F.4th
at 1325. There is no question that Detective Osborn's warrant was deficient—
but it was not so deficient as to render his reliance on it objectively unreasonable.

The affidavit's primary basis for probable cause was the CyberTip from
Synchronoss to NCMEC, which was then forwarded to law enforcement:

On 10/26/2022 I reviewed Cybertip #127205611, which was generated by [NCMEC] after an administrator of Synchronoss advised a user uploaded suspected child sexual abuse material to their account on, or about, 06/15/2022.

Doc. 38 at 22. In insolation, that kind of statement could rightfully be criticized (as it was by the district court) as "barebones" and "conclusory." But Detective Osborn's affidavit also included a robust definitional section designed to provide context and background for "the day-to-day investigation of internet-based crimes against children." *Id.* at 18-22. To be sure, that section's inclusion was also deficient in some ways—it included information and text that could be considered "boilerplate" or irrelevant, and some of its explanations spoke in permissive language that did not clearly state exactly what had occurred in this case. *See id.* Even so, the relevant definitions provide enough context, when read in conjunction with the probable cause statement, for the affidavit to provide at least a "hint" as to why Detective Osborn believed he would find incriminating evidence in the Synchronoss account. *McCall*, 84 F.4th at 1325.

First, consider the reliability of a NCMEC CyberTip. "NCMEC and NCMEC alone is statutorily obliged to maintain an electronic tipline for ISPs to use to report possible Internet child exploitation violations to the government." *United States v. Ackerman*, 831 F.3d 1292, 1296-97 (10th Cir. 2010) (discussing NCMEC's statutory scheme and unique responsibilities). Electronic

communication service providers[6] are required by law to report "to the CyberTipline of NCMEC" "any facts or circumstances from which there is an apparent violation" of federal law "involv[ing] child pornography[.]" 18 U.S.C. § 2258A(a)(1)&(2). NCMEC, in turn, is required "at the conclusion of its review" to "make available each report" to law enforcement. *Id.* at § 2258A(c). An electronic communication servicer provider who "knowingly and willfully fails to make a [required] report" is subject to significant financial penalties. *Id.* at § 2258A(e).[7]

Although a tip from an *anonymous* source, without anything more, is insufficient to provide probable cause, *see, e.g.*, *Taylor v. Alabama*, 457 U.S. 687, 689-90 (1982), a tip from a *known* witness can be enough to establish probable cause, *see Knight v. Jacobson*, 300 F.3d 1272, 1275 (11th Cir. 2002). When determining "[w]hether an informant's tip can give rise to probable cause or arguable probable cause," courts consider "the totality of the circumstances, particularly the informant's veracity, reliability, and basis of knowledge." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1254 (11th Cir. 2013).

---

[6] An "'electronic communication service' means any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. §§ 2258(E)(2), 2510(15)

[7] Providers are also immune from civil or criminal liability related to a report unless they engage in intentional misconduct, act with actual malice, reckless disregard, or for any purpose unrelated to the aims of NCMEC. 18 U.S.C. § 2258B(a)&(b). That is to say, a provider is not liable for generating a CyberTip in good faith.

Synchronoss and NCMEC were known and identified informants entirely unlike anonymous or criminal informants. *See Gates*, 462 U.S. at 233-34 (distinguishing anonymous or confidential tips from those provided by "unquestionably honest citizen[s who] come [] forward with a report of criminal activity"). Indeed, they are much more analogous to an "ordinary witness" whose information "courts have traditionally viewed … with considerably less skepticism than information derived from anonymous sources." *United States v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006). And even in the case of criminal informants—whose reliability is viewed cynically—those who "have a history of cooperation with police" and are "known for the unusual reliability of [their] predictions of certain types of criminal activities in a locality" may be deemed sufficiently reliable "to establish probable cause based on [their] statements alone." *United States v. Williams*, 177 F.App'x 914, 919 (11th Cir. 2006) (quoting *Gates*, 462 U.S. at 233).

NCMEC is so well acquainted with child sexual abuse material that courts have recognized its high reliability in this unfortunate area. *See, e.g., United States v. Cameron*, 652 F. Supp. 2d 74, 82 (D. Me. 2009) (recognizing that "the affidavits reflect that the information was coming from Yahoo! And the NCMEC, and each carries significant indicia of reliability"). The Fifth Circuit, for example, has noted that "NCMEC cyber-tips regularly form the basis of

investigations in both this circuit and across the nation; their reliability have seemingly been rarely questioned." *United States v. Landreneau*, 967 F.3d 443, 453 (5th Cir. 2020). Indeed, "Cyber tips have 'significant indicia of reliability,' and the information contained in such tips is per se substantially certain." *United States v. Meals*, 21 F.4th 903, 908 (5th Cir. 2021) (citing *Landreneau*, 967 F.3d at 453). *See also United States* v. *Lapsins*, 570 F.3d 758, 767 (6th Cir. 2009) (stating that a warrant "supported by [a] NCMEC report" was "reliable enough to contribute to a finding of probable cause")

And the reliability of NCMEC was conveyed within the four corners of the warrant affidavit. The affidavit explained that NCMEC was an organization that had special knowledge and experience regarding child sexual abuse and child sexual abuse materials because it stated that NCMEC "tracks missing and exploited children, and serves as a repository for information about child pornography." Doc. 38 at 19. It further explained that NCMEC was familiar with this type of tip because "[c]ompanies that suspect child pornography has been stored or transmitted on their systems can report that information to NCMEC in the form of a CyberTipline Report (CyberTip)." *Id.* The affidavit also explained that the source of the CyberTip at issue here came from an administrator of the platform where the allegedly unlawful material was held— that is, a source that would be expected to have firsthand knowledge of the

material and who had a statutory obligation to report it. *See id.* at 22. In dismissing the probable cause statement to convey merely "that some entity told NCMEC that there was unlawful child pornography without more," Doc. 46 at 52, the district court failed to give the reliability of the tip and its sources the weight they deserved.

On top of that, the affidavit also explained what a CyberTip is. Doc. 38 at 20. It stated that "[i]n the case of an ESP, the ESP can provide to NCMEC information about the child exploitation activity it believes has occurred" and "NCMEC then packages the information from the [E]SP along with any additional information it has, such as previous related CyberTipline Reports, and sends it to law enforcement." *Id.* It also described the "Categorization System" used by ESPs to "assist with the categorization of images received by ESPs," including that "[t]he system categorizes images related to CyberTipline Reports into four categories," all of which constitute "child pornography" under the federal definition set forth in 18 U.S.C. § 2256(8). *Id.* at 20-21.

While the affidavit discusses how ESPs send and categorize CyberTips, it does falter in one key respect: It never explicitly defines Synchronoss as an ESP. *See id.* at 22. Instead, the affidavit explains that "Synchronoss Technologies is an electronic communication service … and/or remote computing service" as defined by Florida law. *Id.* Despite this technical imperfection, when read as a

whole, the affidavit reasonably communicated that Synchronoss was an ESP. Most significantly, the words "*Electronic Service Provider*" appear on the first page immediately under the warrant application's title, and the "place to be searched" is described specifically as "Synchronoss Technologies." *Id.* at 17 (emphasis in original). This alone strongly indicates that the target of the warrant—Synchronoss Technologies—is an ESP.

But there are other indicators, too. The Florida definitions referenced in the probable cause statement, *id.* at 22, define "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications," and "remote computing service" as "the provision to the public of computer storage or processing services by means of an electronic communications system." Fla. Stat. § 934.02(15), (19). The affidavit's probable cause statement indicated that a Synchronoss administrator "advised [that] a user *uploaded* suspected child sexual abuse material to *their account*." Doc. 38 at 22 (emphasis added). The definitional section's description of "ESPs" describes their functions to include "remote storage," records to include "information concerning content uploaded and/or stored" on the ESP's servers, and states that "[m]any ESPs assign each subscriber" some form of account name. *Id.* at 19-20. Further, the affidavit states within definition of ESP that "[a] service provider that is available to the public and … provides other

30

long-term storage services to the public for electronic and data files, is defined by statute as providing a 'remote computing service'"—a definition that substantially overlaps with the Florida definition of "remote computer service" attached to Synchronoss later in the affidavit. *Id.* And the definition of CyberTip explained that ESPs report "information about …child exploitation activity" to NCMEC, as Synchronoss did in this case. *Id.* at 20.  Even the district court suggested that it was "clear" from the affidavit that Synchronoss was an "ESP" because "that's clearly what [the affidavit is] talking about." Doc. 46 at 26.

In sum, looking at the probable cause statement's description of the CyberTip in light of the definitions provided, the warrant affidavit on its face contained sufficient indicia of probable cause. The affidavit stated that Detective Osborn reviewed a CyberTip (which it defined as a tip that child sexual exploitation had occurred) generated by NCMEC (a highly trusted and reliable source that is knowledgeable about child exploitation) after an administrator at a company (which, like NCMEC, is likely to be reliable and is named in the affidavit) reported that a user uploaded suspected child sexual abuse material. Read in a common-sense manner, the affidavit also conveyed that Synchronoss was an ESP who categorized the suspected CSAM into at least one of four categories all qualifying as child pornography. Although sloppily composed and technically imprecise, the affidavit was not so "bare bones" and conclusory that

it provided "no hint" as to why Detective Osborn believed he would find incriminating evidence in the Synchronoss account. *McCall*, 84 F.4th at 1325. *See also Morales*, 987 F.3d at 975 (holding that an "affidavit [that] did not list especially voluminous evidence" but described two trash pulls three days apart and the affiant's experience in narcotics investigation "was not so bare that the executing officers' belief that [the defendant's] home contained evidence of illegal drug activity was 'entirely unreasonable'").

### B. Detective Osborn's Reliance on the Synchronoss Warrant was Objectively Reasonable

Because the warrant affidavit was not so lacking in indicia of probable cause, this Court will next consider whether Detective Osborn's reliance on the warrant was reasonable. *Martin*, 297 F.3d at 1318. At this stage, the Court may "look beyond the four corners of the affidavit and search warrant." *Id.* at 1318-19. The question "focus[es] on a reasonably well-trained officer and [considers] the totality of the circumstances," including those leading up to the execution of the warrant. *Id.*

Although the government can present evidence outside the four corners of the warrant, the warrant affidavit itself may be sufficient to demonstrate that the officers acted in good faith. *United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003) ("[W]e discern no reason why that burden cannot be met by reference to facts stated within the affidavit."). And that is the case here. For all the

reasons described above, a reasonably well-trained officer could believe that a warrant affidavit based upon a NCMEC CyberTip indicating that user had uploaded suspected CSAM to his cloud account articulated a "fair probability" that evidence of a crime would be found in the account.

That point becomes even stronger when the affidavit is viewed "as understood by those versed in the field of law enforcement," as it must be. *Gates*, 462 U.S. at 231-32, 238; *United States v. Taxacher*, 902 F.2d 867, 871-72 (11th Cir. 1990). And it remains so even when considered in light of a reasonable officer with Detective Osborn's expertise and experience. *See United States v. Ortiz*, 422 U.S. 891 (1975) (explaining that "officers are entitled to draw reasonable inferences from these facts in light of their knowledge of the area and their prior experience with aliens and smugglers"); *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) (noting that "the officer is entitled to assess the facts in light of his experience detecting illegal entry and smuggling"). Detective Osborn explained in the affidavit that he had spent almost 7.5 years in the Special Victim's Unit working on investigations involving the sexual exploitation of children, including investigations into "the receipt, transportation, distribution and possession" of CSAM, and had attended more than 1,500 hours of "advanced training" on child exploitation topics. Doc. 38 at 18. A reasonable officer with Detective Osborn's experience would have been well aware of the reliability of

NCMEC CyberTips—especially given that Detective Osborn stated in the affidavit that he had "investigated more than 600 CyberTipline Reports since 2014." *Id. See Herring v. United States*, 555 U.S. 135, 145 (2009) (explaining that the good-faith inquiry is based on "'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all the circumstances'" and that "[t]hese circumstances frequently include a particular officer's knowledge and experience" (quoting *Leon*, 468 U.S. at 922, n.23)).

A reasonably well-trained officer with Detective Osborn's experience would also know and understand the statutory scheme underlying NCMEC CyberTips. As noted above, electronic communication service providers are statutorily required to report the "facts and circumstances" of any "apparent violation" of federal child abuse statutes involving child pornography. 18 U.S.C. § 2258A(a)-(b). Moreover, the provider is required to "preserve the contents provided in the report for 1 year after the submission to the CyberTipline." *Id.* at 2258A(h). Given these legal requirements, a reasonable officer would know that if a provider made a report to the CyberTipline—as Synchronoss did here—then it probably believed that there had been the commission of one of the child sexual abuse crimes listed in the statute. And a reasonable officer further would have known that the evidence the provider sent through the CyberTipline would

still be in the provider's control because the provider was statutorily required to preserve that information for a year.

Finally, the affidavit expressly stated that Detective Osborn received approval from TPD's Legal Advisor before submitting the warrant to the judge. Doc. 38 at 23. Although the district court dismissed this fact, Doc. 46 at 42, 50-51, participation and approval by an attorney is a favorable factor for determining that an officer had a reasonable belief that the warrant was supported by probable cause. *See, e.g.*, *Millender*, 565 U.S. at 553-555 ("the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the Magistrate provides further support for the conclusion that an officer could reasonable have believed that the scope of the warrant was supported by probable cause."); *Taxacher*, 902 F.2d at 872; *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984); *accord United States v. Cotto*, 995 F.3d 786, 796 (10th Cir. 2021).

The affidavit in this case confirms that Detective Osborn acted in good faith in relying on the warrant. The warrant was founded upon a CyberTip that Detective Osborn would know, based on his extensive training and experience, to be highly reliable indicator of criminal activity. Detective Osborn obtained the approval of TPD's legal advisor before submitting the warrant to the state judge. And there are no extrinsic facts in the record to suggest that Detective

Osborn's reliance on the warrant was objectively unreasonable. *See Robinson*, 336 F.3d at 1297 ("Assuming such evidence existed, [Gibbs] would have been free to present it, but he did not."). In these circumstances, it would not serve a legitimate Fourth Amendment interest to punish Detective Osborn for the issuing judge's error. *Leon*, 468 U.S. at 920. Because Detective Osborn acted in objectively reasonable good faith, the district court's order granting Gibbs's amended motion to suppress all evidence should be reversed.

### C. The District Court's Criticisms Do Not Establish Bad Faith

In granting Gibbs's motion, the district court reasoned that no reasonable officer would believe that the warrant affidavit had sufficient indicia of probable cause given the spareness of the probable cause statement, the mismatch in some terminology, and the inclusion of potentially irrelevant information. The district court's criticisms are understandable, but they do not establish an absence of objectively reasonable good faith.

First, the district court concluded that the affidavit contained only "bare-bones, conclusory statements that no reasonable officer would believe sufficient." Doc. 41 at 5. But that statement can only be deemed true if the Court ignores all of the definitions and surrounding information that provide context for Detective Osborn's admittedly minimal probable cause statement. For the

reasons explained above, this Court should decline to interpret the warrant that way.

The district court concluded that the definition section was not sufficiently linked to the probable cause statement to provide helpful context for that statement. Doc. 41 at 3-4. But in doing so, the court incorrectly employed the type of "hypertechnical" approach this Court has repeatedly discouraged. *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). *See also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("[W]here [some of the circumstances giving rise to probable cause are detailed], where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner."). Instead, the court must apply "a realistic and commonsense approach" to give proper deference to the signing judge's assessment that probable cause was met. *Miller*, 24 F.3d at 1361. Common sense indicates that the definitions in the affidavit were included because they could shed some light on the probable cause statement. And indeed, at least two of the critical terms in the probable cause statement were greatly expounded upon in the definition section. Doc. 38 at 19-20, 22.

It is true, as the district court found, that the definition section included descriptions of tools and terms that were not relevant to this case. *See id.* at 19-

22. But it's hard to see how the inclusion of irrelevant information would lead a reasonable officer to believe that a warrant lacked probable cause. Indeed, in other contexts, the inclusion of information that is knowingly or recklessly false or constitutionally tainted does not defeat probable cause unless the information is deemed "material." *United States v. Novation*, 271 F.3d 968, 987 (11th Cir. 2001); *Murray v. United States*, 487 U.S. 533, 542 (1988). If the inclusion of false and unlawful information does not preclude a finding of probable cause, the inclusion of irrelevant information should not, either. *See Hooks v. Brewer*, 818 F.App'x 923, 929 (11th Cir. 2020) ("If an officer recklessly includes irrelevant information in an affidavit, then probable cause remains intact[.]").

The district court also reasoned that the inclusion of irrelevant definitions would seem to suggest to the reviewing judge facts that were not true—for one example, that there had been a "hash match" to known child pornography. Doc. 46 at 49-50. With due respect to the district court's concerns, a common-sense reading of the probable cause statement in this affidavit—which focuses on a CyberTip generated by NCMEC after Synchronoss reported suspected CSAM—would not mislead a reasonable judge into believing that there had been a hash match, even though the term "hash value" is defined in the definitions section. Nothing in the probable cause statement (or the other clearly applicable definitions) indicates or implies those tools were used. While the

definitional section certainly explains what those terms mean, the definitions themselves provide very limited context for how exactly those terms are relevant to child exploitation investigations or how and by whom those tools are used. *Id.* For example, the definition of "hash value" explains that it "may be run on media to find the precise data from which [it] was generated," *id.* at 21, but neither the definitional section nor the probable cause statement provide any indication whether NCMEC or ESPs use hash values to find child pornography. Rather, the district court drew upon its own, independent knowledge outside the four-corners of the affidavit to make that inference. Doc. 46 at *Id.* at 27-30, 33-35. *See United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982) ("When deciding whether a search warrant was supported by probable cause, we must consider only that information brought to the attention of the issuing judge.").

It is true that the government asked the court to draw inferences linking the probable cause statement to other definitions—namely the sections explaining ESPs and Categorization Tools. Doc. 46 at 30-31, 37-39. But, unlike the irrelevant definitions, the relevance of those terms was apparent from the affidavit's contents as a whole even if they were not cleanly cross-referenced. That is, a common sense reading of the affidavit as a whole indicates that Synchronoss is an ESP, and the description of the "Categorization System" specially states that it "is a tool created by ESPs … to assist with the

categorization of images received by ESPs" by "categoriz[ing] images related to CyberTipline Reports into four categories" of child pornography. Doc. 39 at 20. The district court's focus on the affidavit's use of permissive language suffers from a similar flaw: in stating that a CyberTip was generated by NCMEC here after a Synchronoss administrator reported a user uploaded suspected CSAM, the affidavit makes plain that those relevant things *had* occurred in this case.

The district court also criticized the affidavit for failing to explain what the CSAM at issue here was or whether anyone—either Synchronoss, NCMEC, or Detective Osborn—ever viewed it. Doc. 41 at 5. But, for purposes of probable cause, the exact nature of the material is not determinative: what matters is that a source of unquestionable reliability reported that the material, whatever it may be, depicted child sexual abuse. *See United States v. Cannon*, 703 F.3d 407, 414 (8th Cir. 2013) ("To obtain a warrant, the detectives were not required to show that they had actually found child pornography. Rather, they needed to establish only the 'fair probability that contraband or evidence of a crime will be found in a particular place.' (quoting *Gates*, 462 U.S. at 238)). Moreover, as discussed above, a common-sense reading of the affidavit strongly suggests that the materials associated with the CyberTip fell into at least one of four categories of unlawful child sexual abuse material. And if that still weren't enough, § 2258A explains that CyberTips should be used when the provider believes that the

material involved "child pornography." 18 U.S.C. § 2258A(a)(2)(B). Together, these facts would have allowed a reasonable officer to rely on the warrant issued here.

Finally, the district court repeatedly faulted the government for presenting no extrinsic evidence of Detective Osborn's good faith. But "[t]he good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [judge's] authorization." *Taxacher*, 902 F.2d at 871 (internal quotation marks omitted). So Detective Osborn's subjective reasoning and intent is irrelevant. And although the government was entitled to present extrinsic evidence of objective reasonableness, *Robinson*, 336 F.3d at 1297, it was not necessary here. "That the [g]overnment did not present extrinsic evidence of Detective [Osborn's] good faith … does not itself vitiate a finding of good faith reliance on the warrant." *Id.* This record, as a whole, provides enough helpful context to confirm that Detective Osborn's reliance on this warrant was objectively reasonable.

\*       \*       \*       \*       \*

The exclusionary rule is one of "last resort," not "first impulse." *United States v. Watkins*, 13 F.4th 1202, 1210 (11th Cir. 2021). It is a rule this Court hesitates to apply because its use "'generates substantial social costs, which

41

sometimes include setting the guilty free and the dangerous at large' and which take a 'costly toll upon truth-seeking and law enforcement objectives.'" *Id.* (quoting *United States v. Delancy*, 502 F.3d 1297, 1314 (11th Cir. 2017)). Instead, this Court "reserve[s] the exclusionary rule 'only [for] where its remedial objectives are thought most efficaciously served—that is, where its deterrence benefits outweigh its substantial social costs.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). "And to justify application of the rule those deterrence benefits cannot be merely incremental, marginal, or simply possible; they must be substantial and must actually outweigh the costs." *Id.* That only happens in the face of deliberate, reckless, or grossly negligent law enforcement misconduct. *Davis v. United States*, 564 U.S. 229, 238, 240 (2011). The deterrence rationale justifying exclusion "loses much of its force" when the officer's "conduct involves only simple, 'isolated' negligence." *Id.* at 238. In that circumstance, "exclusion cannot 'pay its way[.]'" *Id.*

Make no mistake: the warrant in this case should have been better. And it easily could have been better. But it was not so obviously devoid of probable cause that Detective Osborn (or any reasonable officer) would have known the ensuing search—conducted only after the warrant was approved by a legal advisor and signed by a state judge—violated the Fourth Amendment. Law enforcement officers have nothing to gain by omitting incriminating facts that

would have only helped them to gain the signing judge's approval. The warrant requirement already deters that type of negligence by requiring independent, judicial approval of probable cause. In the usual case, that negligence is punished by the judge's disapproval of the warrant. The exclusionary rule exacts a high price—here, the suppression of highly reliable evidence of Gibbs's sexual abuse of a 14-year-old girl. Detective Osborn's negligence in drafting this warrant, and the value of deterring similar negligence in the future, is not enough to pay it.

## CONCLUSION

For the reasons stated above, the United States, Appellant, respectfully requests that this Court reverse the district court's order granting Gibbs's amended motion to suppress.

Respectfully submitted,

JASON R. COODY
United States Attorney


JORDANE NEW
Assistant United States Attorney
Appellate Division
Northern District of Florida
Florida Bar No. 117808
111 North Adams Street, 4th Floor
Tallahassee, FL 32301
(850) 942-8430
jordane.new@usdoj.gov

CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7).  This brief contains <u>10,594</u> countable words.


CERTIFICATE OF SERVICE

I certify that one copy of the foregoing has been furnished, via the Court's CM/ECF, to the following counsel of record this 23rd day of December 2024:

**Stacy Niles Kime**
Assistant Federal Public Defender
Counsel for Defendant-Appellee Gibbs
227 N. Bronough Street, Suite 4200
Tallahassee, Florida 32301

JORDANE NEW
Assistant United States Attorney

44